# Louisville & Nashville R. R. Co. *v.* Bouchard.

## *Setting Out Fire.*

(Decided December 17, 1914. Rehearing denied January 21, 1915. 67 South. 265.)

1. *Railroads; Fire; Negligence; Jury Question.*—Under the evidence in this case it is a question for the jury to determine whether the fire was started by a spark from defendant's locomotive, and whether there was negligence in the handling or equipment of the locomotive.

2. *Evidence; Demonstrative; Cinders.*—Where the action was for the destruction of a building and contents by a fire alleged to have been started by a locomotive, and a witness testified that, after the train passed and set fire to the grass in her field, she picked up some cinders which had fallen in the grass, the cinders were properly admissible in evidence when produced by the witness.

3. *Railroads; Fires; Evidence.*—Where the action was for damages from fire alleged to have been started by a locomotive, it was competent for plaintiff to testify as to the direction in which the

wind was blowing when he awoke, about fifty minutes after the train had passed.

4. *Same; Instruction.*—The fact that the distance which witnesses estimated sparks to have been carried by the wind was found by a close calculation, to be less than the distance required in order that the fire in question might have been started by like sparks from a locomotive of defendant, did not require the court to give an instruction, the effect of which would have been to require a verdict for defendant.

5. *Same.*—A charge requested directing a finding for defendant if the wind was blowing in the same direction when the train passed the place where the fire was started as when it passed the witness' house, was misleading, as it might be construed as referring to the exact direction of the wind, and omitting any consideration of velocity or variation in either direction or velocity.

6. *Charge of Court; Degree of Proof.*—A charge directing a finding for defendant if the evidence left the minds of the jurors in doubt, confusion or uncertainty as to a certain fact, in effect required plaintiff to prove his case beyond the slightest doubt, and was therefore, properly refused.

7. *Appeal and Error; Harmless Error; Instruction.*—A statement by the court disclosing that the court had previously refused instructions given at the request of defendant, did not require a reversal where the jury may have understood therefrom that upon reflection the court was persuaded that such instructions were correct.

8. *Same; Review; Showing Error.*—Error is never presumed on appeal, but must be made to affirmatively appear.

APPEAL from Mobile Law and Equity Court.

Heard before Hon. SAFFOLD BERNEY.

Action by Robert E. Bouchard against the Louisville & Nashville Railroad Company for damages for setting out fire. Judgment for plaintiff, and defendant appeals. Affirmed.

The facts sufficiently appear from the opinion of the court. The following charges were requested by, and refused to, defendant: (2) The court charges the jury that, if they believe from the evidence that the wind was blowing in the same direction when train No. 2 passed St. Elmo, that it was blowing when Mrs. Sailor and her daughter saw it pass Mrs. Sailor's place, they ought to find a verdict for defendant.

(7) The court charges the jury that, if the evidence leaves their minds in doubt, confusion, and uncertain-

ty as to whether, at the time train No. 2 passed St. Elmo, the wind was or was not blowing in the same direction that it was blowing when the train passed the residence of Mrs. Sailor, they ought to find for defendant.

GREGORY L. & H. T. SMITH, and JOEL W. GOLDSBY, for appellant.

GORDON & EDDINGTON, and WEBB & McALPINE, for appellee.

GARDNER, J.—Suit was brought by appellee against appellant to recover damages for setting fire to his residence, barn, and storehouse with contents, and also one wagon. Upon the trial the issues of fact were presented to the jury and resulted in a judgment for the plaintiff, from which this appeal is prosecuted.

(1) The first question to be considered is the sufficiency of the evidence to justify a reasonable inference by the jury that the fire was in fact caused by one of the defendant's locomotives. Plaintiff testified in part as follows: "That on and prior to the 29th day of May, 1913, he owned property situated at St. Elmo, in the county of Mobile, 230 feet south of the center of the defendant's railroad, which runs at that point practically due east and west—a little northeast. That his property consisted of a barroom, a store, a residence, and a barn, and their contents. That the barroom was west of and adjoining the store, and the store was west of and adjoining the residence, and the barn southwest of the store. That defendant's depot was a little to the west of his buildings—northwest. That the west side of the depot was about 300 feet from his property. That the barroom was covered with tarred paper, which was old and

'had become fuzzy and inflammable. That about 2 o'clock a. m. plaintiff was awakened by the rapid blowing of the whistle of an approaching north-bound train, and put on his trousers and went out and found that the. top of the barroom was on fire. That there was a strong wind blowing from the north—a little to the east—across the railroad track and towards his property. That the wind was blowing very nearly like it was blowing on the day on which the witness was testifying. That the weather was dry, and that there was no dew that night. That he did all that he could to save his property. That at the time that he got up the fire covered only a space of two or three yards in diameter, and was reaching towards the roof of the store, but that there was no fire between the roof and the ground. That, after the fire was out, he went to the depot, and it was then between 2 and 3 o'clock. That he went all around the property, and that there was no fire on the outside of any of the buildings. That the buildings were all closed and securely fastened, and the fire was on top. That there had been a fire in the residence that night, but none in the store or barroom. That the store and dwelling were hardly two feet from the ground, and the barroom was right down on the ground. That there was never any fire in the barroom or wareroom that caught fire."

He was then. asked the following question: "Was there any fire in your particular neighborhood there from which this blaze caught? No, sir; it was too far off, there was no fire."

The witness further testified: "That his property that was destroyed by fire was worth about $16,000, and he listed the property item by item, giving the value or loss by burning of each item; that the property figured over $15.000."

[Louisville & Nashville R. R. Co. v. Bouchard.]

On further examination he stated that defendant's north-bound passenger train passed St. Elmo at 9 minutes after 1 o'clock in the morning; that the fire spread to the roof of the store and then to the residence; that the wind was blowing 10 or 15 miles an hour, and there was no fire at all between the ground and the roof; that the fire went straight on up the roof of the main store, and then over to the roof of the dwelling, and caught all the other buildings and burned them; that an engine threw sparks straight up, and the drift of the sparks is due to the wind; that he had seen sparks go up and fall a hundred feet from the train with an ordinary breeze of four or five miles an hour.

It was shown by testimony of Mrs. Sailor and her daughter Hazel Sailor: That they were both up when passenger train No. 2 of defendant passed their house on the morning of May 29, 1913, going north towards St. Elmo, and they learned of the fire that destroyed plaintiff's property the next morning after it occurred. That the train passed the house at 7 minutes after 1 o'clock according to Mrs. Sailor, and 9 minutes after 1 o'clock according to Miss Sailor, and was running from 35 to 40 miles an hour. Their house was on the same side of the track as plaintiff's store (south), and was one mile (as stated in one part of her testimony) from St. Elmo, or one and a half miles as stated in another part. Mrs. Sailor stated she had frequently observed trains passing, her house being about 140 yards from the track. Her testimony shows that train No. 2 was a fast passenger train, and that she saw this train pass her house "that night," going towards St. Elmo, and indicated it was up-grade in that direction. That it passed very rapidly, and was throwing sparks from the locomotive smokestack in larger quantities than usual.

That trains frequently threw out sparks in passing, but she had never seen a train throw them out in as large quantities, and that they looked to be from two to three inches in diameter. That some of the sparks thrown from the engine were carried 235 feet by the wind back on her place and set the grass on fire, and she picked up some cinders that had fallen in the grass "right where the fire started," and she produced these cinders, which were offered in evidence. That the weather was perfectly dry, and there was no dew, and "there was a pretty good wind blowing." That the sparks continued to fly from the engine as far as she could see them. There was a strip of timber between her place and St. Elmo, and, after the train passed this strip, she could see the sparks going up above the timber and could see them for a distance of about three-fourths of a mile. On cross-examination, she stated that the wind was strong and was blowing from the northeast, and the sparks were thrown 50 or 60 feet in the air and were blown back by the wind in a southeasterly direction into her field; that she measured from the spot where the locomotive was when it threw out the sparks to the place where the field caught, and it was 235 feet, but measured at right angles from the track it was 190 feet.

The witness Miss Hazel Sailor testified, in substance, as did her mother. She further stated that the "wind was blowing pretty nearly a gale—a heavy blow—from the northeast." Her testimony would rather indicate that the measurement made to ascertain the distance the sparks fell was at right angles and showed 235 feet, though we do not deem this at all of controlling importance.

Plaintiff also offered testimony of one Chessen, who testified: That "on the night plaintiff's property was

burned he was 50 yards from defendant's track and about a mile west of St. Elmo." That he saw train No. 2 go by, and was running "pretty fast." "That she was throwing out a lot of sparks, more like a man with a shovel lifting them up and throwing them out of the smokestack. * * * That after the train had passed his house going towards St. Elmo, he could see her throwing sparks for about half a mile. That about half hour after the train passed, he saw a fire at St. Elmo about big as a barrel."

Plaintiff, it is therefore seen, offered testimony to show the passage of fast passenger train No. 2, about 50 minutes before discovery of the fire; that the fire when discovered was on top of the shedroom or barroom adjoining the store, which was covered with tar paper that was old and had become fuzzy and inflammable; that there was no fire between the roof and the ground, no open doors, no probability of any cause for the fire in the surroundings; that it was perfectly dry and no dew and a strong wind, "pretty nearly a gale," as stated by a witness, from the north as shown by some of the witnesses, and a little northeast by others, but blowing in the direction from the track towards the property of plaintiff, and the emission from the engine of sparks of unusual size and in unusual quantities seen by some to a distance of within about one-fourth of a mile from St. Elmo, according to one part of the testimony of Mrs. Sailor.

As said in *Deason v. A. G. S. R. R. Co.,* 186 Ala. 100, 65 South. 172: "It is a matter of common knowledge that a strong wind may carry such sparks to a considerable distance, and that they may readily set fire to any dry and inflammable materials upon which they happen to fall."

And in the instant case there was evidence tending to show that sparks from the engine of train No. 2 were carried by the wind a distance of 235 feet and set fire to grass in the adjoining field, just one mile west of St. Elmo. As said in *Deason v. A. G. S. R. R. Co., supra*: "We think that the imputation of the fire to sparks from the locomotive is fairly removed from the realm of mere speculation, and is brought fairly within the realm of legitimate and permissible inference."

We are well convinced that the evidence in this case was sufficient for a submission of this question to the jury.—*Deason v. A. G. S. R. R. Co., supra.*

In *Coffman v. L. & N. R. R. Co.,* 184 Ala. 474, 64 South. 527, it was said: "While we are on this subject, we may as well say that when, in a case like the present, there is evidence that a locomotive on a particular occasion emitted live sparks of unusual size, or that it emitted live sparks in unusual numbers, or that it threw live sparks to an unusual distance, then it is a question for the jury, and for the jury alone, to say whether the locomotive was or was not, at the particular time, properly and skillfully handled, or whether or not it was properly constructed, or properly equipped."

The evidence to which we have above referred shows that the engine emitted live sparks of unusual size and in unusual quantity, and, notwithstanding proof by defendant of proper equipment and proper handling of the train and locomotive, this, under our authorities, was sufficient to carry the question of negligence to the jury.—*Coffman v. L. & N. R. R. Co., supra; L. & R. R. Co. v. Stanley,* 186 Ala. 95, 65 South. 39.

It is insisted by appellant, however, that in addition to proof of proper equipment and handling of the locomotive, defendant proved by the engineer and the con-

ductor of the train that when the train reached within a quarter of a mile of St. Elmo steam was shut off, and they "rolled by St. Elmo," and therefore no sparks could have been emitted from the engine with steam shut off. The testimony of these witnesses discloses that this was done in order to slow up; that is, "kill time," and to prevent reaching the station ahead of schedule time. As previously shown, evidence of witnesses for the plaintiff would tend to show the train was running fast, 35 or 40 miles an hour, when within a mile of St. Elmo, and that it was due there 9 minutes after 1 o'clock. Mrs. Sailor testified it passed her house (at least a mile away) at 7 minutes after, and Miss Sailor stated at 9 minutes after, 1 o'clock. This testimony would indicate the train was not ahead of schedule time, and hence no necessity to slow up and "kill time," as testified. From all the evidence in the case we are of the opinion it was for the jury to determine whether or not sparks from the locomotive of the defendant set fire to the property, and whether or not, also, there was negligence either in the handling of the locomotive or as to its proper equipment.

(2) Without regard to the rule as to the shifting of the burden of proof (*Tombigbee Valley R. R. Co. v. Howard,* 185 Ala. 612, 64 South. 338), plaintiff offered testimony to establish both the origin of the fire and negligence at the outset, which was, of course, entirely permissible. The above questions are presented for review by several assignments of error which we have not deemed necessary to treat separately. Some of them attempt to present the question by motion to exclude the evidence because plaintiff failed to make out his case, etc. We merely call attention to the fact that this practice has been recently condemned by this court.—*McCray*

*v. Sharpe,* 188 Ala. 375, 66 South. 441. See, also, *Scales v. Central Iron & Coal Co.,* 173 Ala. 646, 55 South. 821. The testimony of Mrs. Sailor shows that, the morning after the train passed and set fire to the grass in her field, she picked up some cinders that had fallen in the grass "right where the fire started," and these cinders offered in evidence, produced by her, were clearly admissible.

(3) Nor was there any error in overruling motion of defendant to exclude testimony of plaintiff as to direction in which the wind was blowing at the time he awoke. This was about 50 minutes after the passage of the train, and, in connection with all the other evidence was clearly relevant.

(4, 5) Charge No. 2 was properly refused. The argument seems to be based upon arithmetical calculation. of counsel as to distance the sparks were carried by the wind as testified to by Mrs. Sailor, measured at right angles from the track (190 feet) and that therefore, the argument proceeds, for the sparks to have set fire to property of plaintiff the sparks would have to be carried 274½ feet, as such property was situated 230 feet from the track measured at right angles. The argument cannot be accepted so as to justify the charge. In drawing reasonable inferences from the facts adduced, the jury are not to be confined to such fine calculations. There was evidence that sparks from this engine were carried 235 feet. The charge is misleading, in that, it might be construed as referring to the exact direction of the wind at the time the train passed Mrs. Sailor's house, and omits any consideration whatever as to its velocity, and takes no account of any variations as to either. While both the direction and the velocity of the wind may remain the same in a general sense for some

time, yet it is common knowledge that there are at least slight variations from moment to moment as to both direction and velocity. Indeed, counsel for appellant so state in brief as follows: "It is common knowledge that the direction and force of the wind is not only not continuous in its nature, but varies from second to second, both in force and direction."

Without regard as to whether the charge is otherwise faulty, it was clearly misleading and properly refused.

(6) Charges 7 and 8, stating to the jury "if the evidence leaves their minds in doubt, confusion, and uncertainty," etc., were properly refused.—*A. G. S. R. R. Co. v. Robinson,* 183 Ala. 265, 62 South. 813; *Monarch Livery Co. v. Luck,* 184 Ala. 518, 63 South. 656.

(7). The twelfth assignment of error is in part as follows: "The court erred in stating, in the hearing of the jury, as follows: 'I give charges 3, 4, 5, and 9 requested by the defendant, which I refused, because plaintiff's attorneys request it.' The exception upon which this assignment of error is based reads as follows: 'The defendant had, in writing, requested the court to give a number of charges, and the court had indorsed upon charges 3, 4, 5, and 9 the word, "Refused," and signed his name thereto. Such charges were as follows: (The charges are here omitted.)' After so marking such charges, they were, in accordance with the custom of the court to submit written charges to opposing counsel for their suggestion, handed to the plaintiff's attorneys without the knowledge of the jury, and, after inspecting such charges, the plaintiff's attorneys suggested to the court, but not in the hearing of the jury, that the charges should be given. A little later, in the course of the trial, the court, in their pres-

ence and hearing, made this remark: 'I give charges 3, 4, 5, and 9 requested by the defendant, which I had marked "Refused," because plaintiff's attorneys request it.' The defendant's counsel, then and there, in the presence of the jury, reserved an exception in the following language: 'We except to your honor's giving those charges and announcing in the hearing of the jury that they had previously been refused.' This is the court's reply: 'And which said charges had not been near to the jury.' The court had, in the meantime, erased the word 'Refused,' from such charges, and had written on each of them the word, 'Given,' and signed his name upon each of them after the word, 'Given.' Thereafter, the defendant's counsel, in the course of his argument to the jury, read every one of the written charges given to the jury at the request of the defendant, including said charges 3, 4, 5, and 9, and stated to the jury that those charges constituted the law of the case as requested by the defendant and charged by the court."

(8) It is the general rule that all intendments and presumptions will be here indulged in support of the action of the court below. Error will not be presumed on appeal; it must be made to affirmatively appear. We must consider and treat the exception as we find it, and the exception relates, not to the entire statement of the court, but only to the announcement in the hearing of the jury that the charges had "previously been refused." If inferences favorable or unfavorable may be drawn from language used as on this occasion, we should lean to the favorable inference, rather than the unfavorable in recognition of the general rule just stated. It can be said of this language, following the exception taken, that, while the court was first of opinion the charges were incorrect, yet upon reflection, and

[Empire Coal Co. v. Martin.]

it may be even on consultation with counsel, he was persuaded that they were correct and properly stated the law in the case. Clearly the language is susceptible of such construction as presented here by this record. Such being the case, and indulging in presumption in favor of the action of the court below, we are of the opinion that no error to reversal is shown; nor do we intend to indicate, in what is here said as to this assignment and the exception taken as appears in the record, that any error would appear had the exception embraced all the language used by the court; but we, of course, here treat the exception as it was taken. As the charges were given, it is, of course, unnecessary to consider them.

We have reviewed the questions presented by the record and argued by counsel, and finding no error, the judgment of the court below is, accordingly, affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ..